consequences) renders that proceeding the functional equivalent of "no prior adjudication," which eliminates consideration of § 43-292(6) as a ground for termination. Our review of the one remaining ground, § 43-292(4), reveals insufficient evidence in the record to support termination. Accordingly, we reverse the order of the juvenile court terminating Michael's parental rights to Keisha.

REVERSED.

---

STATE OF NEBRASKA, APPELLEE, V.
NICHOLAS J. PODRAZO, APPELLANT.
___ N.W.2d ___

Filed December 10, 2013.    No. A-12-257.

1. **Criminal Law: Trial: Pretrial Procedure: Motions to Suppress: Appeal and Error.** In a criminal trial, after a pretrial hearing and order denying a motion to suppress, the defendant must object at trial to the admission of evidence sought to be suppressed to preserve an appellate question concerning admissibility of that evidence.

2. **Trial: Evidence: Motions to Suppress: Waiver: Appeal and Error.** A failure to object to evidence at trial, even though the evidence was the subject of a previous motion to suppress, waives the objection, and that party will not be heard to complain of the alleged error on appeal.

3. **Trial: Evidence: Stipulations: Waiver.** A concession or stipulation as to a fact made for the purpose of trial has the force and effect of an established fact binding on the party making the same, as well as on the court, unless the court in its reasonable discretion allows the concession to be later withdrawn, explained, or modified if it appears to have been made by improvidence or mistake.

4. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. But whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

5. **Constitutional Law: Search and Seizure.** The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution protect individuals against unreasonable searches and seizures by the government. These constitutional provisions do not protect citizens from all governmental intrusion, but only from unreasonable intrusions.

6. **Constitutional Law: Warrantless Searches: Search and Seizure.** Warrantless searches and seizures are per se unreasonable under the Fourth Amendment,

subject only to a few specifically established and well-delineated exceptions, which must be strictly confined by their justifications.

7. **Warrantless Searches.** The warrantless search exceptions recognized by Nebraska courts include searches undertaken with consent, searches justified by probable cause, searches under exigent circumstances, inventory searches, searches of evidence in plain view, and searches incident to a valid arrest.

8. **Warrantless Searches: Search and Seizure: Proof.** In the case of a search and seizure conducted without a warrant, the State has the burden of showing the applicability of one or more of the exceptions to the warrant requirement.

9. **Warrantless Searches: Search and Seizure: Motor Vehicles: Police Officers and Sheriffs.** The warrantless seizure of a vehicle is lawful when the officers could have immediately searched the vehicle without a warrant.

10. **Warrantless Searches: Motor Vehicles: Police Officers and Sheriffs: Probable Cause.** Whether a warrantless search of a vehicle could have been conducted is determined by whether the vehicle was readily mobile and the officers had probable cause to believe the vehicle contained contraband or evidence of a crime.

11. **Probable Cause: Words and Phrases.** Probable cause escapes precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances.

12. ____: ____. Probable cause is a flexible, commonsense standard. It merely requires that the facts available to the officer would warrant a person of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false.

13. **Probable Cause: Appeal and Error.** Appellate courts determine probable cause by an objective standard of reasonableness, given the known facts and circumstances.

14. **Rules of Evidence.** In all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by the Nebraska Evidence Rules, not judicial discretion, except in those instances under the rules when judicial discretion is a factor involved in determining admissibility.

15. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion.

16. **Constitutional Law: Criminal Law: Witnesses.** The Sixth Amendment provides that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him and to have compulsory process for obtaining witnesses in his favor.

17. **Judges: Evidence: Appeal and Error.** The exercise of judicial discretion is implicit in determinations of relevancy and prejudice, and a trial court's decision regarding them will not be reversed absent an abuse of discretion.

18. **Evidence: Words and Phrases.** Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

19. **Rules of Evidence: Appeal and Error.** The exercise of judicial discretion is implicit in determinations of relevancy and admissibility under Neb. Rev. Stat.

§ 27-406 (Reissue 2008), and as a result, the trial court's decision will not be reversed absent an abuse of discretion.

20. **Trial: Evidence.** The precise contours of how frequently and consistently a behavior must occur to rise to the level of habit cannot be easily defined or formulated, and admissibility depends on the trial judge's evaluation of the particular facts of the case.

21. ____: ____. Evidence of a single incident, even if it is true, is an insufficient showing of a routine or habit.

22. **Pretrial Procedure: Appeal and Error.** A trial court has broad discretion in granting discovery requests and errs only when it abuses its discretion.

23. **Physician and Patient: Evidence.** Generally, confidential communications made by a patient to a physician or professional counselor for the purposes of diagnosis and treatment are privileged.

24. **Physician and Patient: Evidence: Witnesses: Proof.** Before the testimony of a witness is excluded under Neb. Rev. Stat. § 27-504 (Reissue 2008), the defendant must make a showing that the failure to produce the privileged information is likely to impair the defendant's ability to effectively cross-examine the witness claiming the privilege. If the defendant succeeds in making such a showing, the court may then afford the State an opportunity to secure the consent of the witness for the court to conduct an in camera inspection of the claimed information and, if necessary, to turn over to the defendant any relevant material for the purposes of cross-examination. If the witness does not consent, the court may be obliged to strike the testimony of the witness.

25. **Trial: Expert Witnesses.** The trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion.

26. **Trial: Courts.** A trial court has broad discretion in determining how to perform its gatekeeper function.

27. **Expert Witnesses: Appeal and Error.** The standard for reviewing the admissibility of expert testimony is abuse of discretion.

28. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

29. **Jury Instructions: Appeal and Error.** Whether a jury instruction is correct is a question of law, regarding which an appellate court is obligated to reach a conclusion independent of the determination reached by the trial court.

30. **Jury Instructions.** A trial court is not obligated to instruct the jury on matters which are not supported by evidence in the record.

31. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.

32. **Jury Trials: Affidavits: Appeal and Error.** Errors predicated on occurrences during the course of voir dire examination cannot be shown by affidavit.

33. **Jury Trials: Records: Appeal and Error.** An appellate court will not undertake to resolve disputes about what is claimed to have happened, when a record of the voir dire examination could have been made.

34. **Motions for Mistrial: Appeal and Error.** An appellate court will not disturb a trial court's decision whether to grant a motion for mistrial unless the court has abused its discretion.

35. **Motions for New Trial: Appeal and Error.** A motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.

36. **Criminal Law: Jury Misconduct: Proof.** A criminal defendant claiming jury misconduct bears the burden of proving, by a preponderance of the evidence, (1) the existence of jury misconduct and (2) that such misconduct was prejudicial to the extent that the defendant was denied a fair trial.

37. **Criminal Law: Juror Misconduct: Presumptions: Proof.** In a criminal case, when misconduct involves a juror and a nonjuror, it gives rise to a rebuttable presumption of prejudice to the defendant which the State has the burden to overcome.

38. **Witnesses: Juror Misconduct: Appeal and Error.** An appellate court reviews the trial court's determinations of witness credibility and historical fact for clear error and reviews de novo the trial court's ultimate determination whether the defendant was prejudiced by juror misconduct.

39. **Trial: Prosecuting Attorneys.** Whether prosecutorial misconduct is prejudicial depends largely on the context of the trial as a whole.

40. **Motions for Mistrial: Prosecuting Attorneys: Proof.** Before it is necessary to grant a mistrial for prosecutorial misconduct, the defendant must show that a substantial miscarriage of justice has actually occurred.

41. **Sentences: Appeal and Error.** Sentences within statutory limits will be disturbed by an appellate court only if the sentences complained of were an abuse of judicial discretion.

Appeal from the District Court for Douglas County: James T. Gleason, Judge. Affirmed.

Denise E. Frost and Clarence E. Mock, of Johnson & Mock, for appellant.

Jon Bruning, Attorney General, and Nathan A. Liss for appellee.

Inbody, Chief Judge, and Irwin and Riedmann, Judges.

Riedmann, Judge.

## I. INTRODUCTION

Nicholas J. Podrazo appeals from his conviction in the district court for Douglas County for the first degree sexual assault and attempted first degree assault of A.T. Because we find no merit to Podrazo's arguments on appeal, we affirm.

## II. BACKGROUND

### 1. Events Surrounding Charges

The events surrounding this case began on December 23, 2010. At that time, A.T. was living near 22d and Maple Streets in Omaha, Nebraska (Maple Street residence), with her friends Richard Gregory, Ellen Mruz, Brett Smith, and Ashley Forsman. A.T., Mruz, Smith, and Forsman began drinking alcohol sometime in the afternoon on December 23. Around 7 p.m., A.T. and Forsman left to have dinner with A.T.'s mother. While they were gone, Podrazo and two other men arrived at the Maple Street residence; Podrazo brought a bottle of rum and a box of "whip-it" canisters with him. When A.T. and Forsman returned from dinner, they joined everyone in drinking rum, "doing whip-its," and smoking marijuana.

Around 9:30 p.m., the partygoers noticed that A.T. and Podrazo were missing. They searched the inside and outside of the residence but could not find them. Mruz called Podrazo's cell phone numerous times, and when he finally answered, he told her that he was "just driving around." When Mruz asked to speak to A.T., the cell phone disconnected. Mruz and a couple of others noticed that A.T.'s car and keys were still at the house, but that Podrazo's white Chevrolet (Chevy) Blazer was missing. They drove around the neighborhood in A.T.'s car looking for her but were unable to find her.

Around 11:15 p.m. that night, a man and his fiance were returning to their home near 73d and Pratt Streets in Omaha (Pratt Street residence), when they noticed a white Chevy Blazer parked in the street near their driveway. The man attempted to look in the windows of the Blazer, but they were darkly tinted and fogged over, so he could not see anything inside except some clothing on the front seat. He went inside his house, and when he looked out the window 5 or 10 minutes later, the Blazer was gone. Shortly after that, passersby discovered a nude, unresponsive female lying on the side of the road near where the Blazer had been parked and called the 911 emergency dispatch service. An ambulance arrived a few minutes later and transported the female, later identified as A.T., to a hospital.

A.T. was initially kept sedated at the hospital, but after a few hours, she was allowed to wake up. She told the nurse that the last thing she could remember was returning to the Maple Street residence the previous night after eating dinner with her mother, and then taking a shot of rum. She did not remember seeing Podrazo or leaving the residence at all.

A.T. consented to a sexual assault examination. The examination revealed several bruises on her legs and a bruise near each eye, as well as abrasions on the back of her shoulder, the middle of her back, the side of her breast, and her cheek and nose. A.T. also had extensive injuries to her entire genital area. Her external vaginal area was reddened, and her hymen and anus were each torn in two places. She had petechial hemorrhaging, extensive purple bruising, and swelling throughout her entire vaginal canal, as well as bruising from the opening of the vagina up to and all the way around her cervix. The nurse who performed the examination testified at trial that A.T.'s injuries were "[s]evere" and caused by blunt force trauma. In addition to these injuries, A.T. was diagnosed with a concussion, mild hypothermia, and first-degree frostbite on one finger. Her blood alcohol content was .457 of a gram of alcohol per deciliter of blood.

Several of A.T.'s friends, including Smith and Joshua Phillips, visited her in the hospital the morning of December 24, 2010. After speaking with A.T. at the hospital, Smith, Phillips, and another friend went to Podrazo's house to confront him about what happened to A.T. Podrazo changed his story several times, but eventually admitted to them that he had sex with A.T. and that "it was rough." Podrazo then handwrote a note stating that he and A.T. left the Maple Street residence and ended up pulling over in a neighborhood and having sex in his vehicle. He wrote that it "got a little crazy" and that "it was pretty rough." Phillips gave that note to A.T.'s mother, who gave it to police.

### 2. Investigation

Detectives William Seaton and Kristine Love from the Omaha Police Department were assigned to investigate this

case. After speaking with the officers who responded to the scene at the Pratt Street residence and questioning A.T., Smith, Phillips, and Mruz at the hospital, the detectives were able to gather information on Podrazo. Specifically, they located his address and learned there was a 1999 white Chevy Blazer registered in his name. They went to Podrazo's residence, which was in Douglas County, but outside the city limits of Omaha, and at the request of Seaton, three additional Omaha police officers and a deputy from the Douglas County sheriff's office accompanied them. The law enforcement officers arrived at Podrazo's residence on the evening of December 24, 2010. They located a white Chevy Blazer that matched the witnesses' descriptions, and Seaton asked the Douglas County sheriff's deputy to tow the vehicle to the city-county impound lot so that it could be searched and processed.

Omaha police applied for and received a search warrant for the Blazer on December 27, 2010, and the search was conducted that day. Blood was found in several locations inside Podrazo's Blazer, and samples taken from the rear center seat cushion and the handle of an ice scraper found in the cargo compartment matched A.T.'s DNA. Podrazo was ultimately arrested and charged with first degree sexual assault and attempted first degree assault.

### 3. Motions

### (a) Motion to Suppress

Prior to trial, Podrazo moved to suppress the evidence found in his Blazer. He argued that he did not consent to the search and seizure of his vehicle and that law enforcement did not have a warrant to search or seize the vehicle on December 24, 2010.

Love testified at the suppression hearing that when she first became involved in the case, she was informed that an occupant of the Pratt Street residence had told officers that he had seen a white 1990's Chevy Blazer with darkly tinted windows parked in front of his residence in the location where A.T. was later found lying in the street. Love stated she spoke with several of A.T.'s friends at the hospital on December 24,

2010, and learned that on the prior evening, Podrazo had been at the Maple Street residence with A.T., and that they both ended up missing along with Podrazo's white Chevy Blazer. Love testified Mruz told her the general location of Podrazo's residence and that he drove a "white utility vehicle." Love also recounted her conversation with Phillips, during which Phillips told her Podrazo said that A.T. had been in his vehicle the previous night and that they had a sexual encounter inside of the vehicle. Additionally, Love testified that she spoke with the nurse who performed A.T.'s sexual assault examination and learned of the nature and extent of A.T.'s injuries.

Love testified that after obtaining all of this information, she contacted Seaton and provided him with the information she had gathered. They located Podrazo's exact address, and she asked Seaton to go there to make contact with Podrazo and see whether the white Chevy Blazer was present at the residence. Love explained that she was interested in the vehicle because, at that time, there was enough information to establish that the Blazer was the crime scene. After learning that Podrazo and his vehicle had been located at the residence, Love went to the residence herself and observed the vehicle parked in the driveway. When she arrived at Podrazo's residence, the Douglas County sheriff's deputy and other Omaha police officers were already at the scene.

Love admitted that she was not given consent to take the Blazer, but decided to seize it because she considered it the crime scene based on the information she had received from witnesses. She expressed concern about preserving any evidence contained in or on the Blazer. Because it was wintertime, Love was concerned that biological evidence on the outside of the vehicle could be destroyed or altered by wet snow. In addition, there were three people in the residence that could have moved the vehicle from its location or disrupted any evidence contained inside the vehicle. The court overruled Podrazo's motion to suppress, concluding that police had probable cause to justify the warrantless seizure and subsequent search of the Blazer.

### (b) Motion to Offer Evidence

Prior to trial, Podrazo also provided notice to the court of his intent to offer certain evidence at trial. Specifically, he intended to offer evidence that A.T. admitted she is "always drunk or 'high'" when she engages in sexual relations and that at least once prior to December 2010, A.T. had "'blacked out'" and later learned that she had engaged in voluntary sexual relations while drunk and/or high. He also notified the court that he intended to offer evidence that in the 12 to 18 months prior to December 2010, A.T. had been diagnosed with mental health issues, substance abuse, and cognitive difficulties and at least twice had received inpatient and intensive outpatient treatment for these conditions. The court denied Podrazo's request to introduce the proffered evidence.

### (c) Motion for Access to
### Medical Records

Prior to trial, Podrazo requested access to A.T.'s medical and mental health records or, if A.T. refused to allow access to the records, he requested that A.T. be prohibited from testifying at trial. The court denied the request, concluding that A.T.'s records were privileged and that there was no showing that denial of access to the records would deny Podrazo his right to confront the witness.

### (d) Motion to Offer
### Habit Evidence

After trial began, Podrazo moved to offer evidence under Neb. Rev. Stat. § 27-406 (Reissue 2008) of A.T.'s "habit" of alcoholic blackouts as well as wandering during intoxication while inappropriately dressed. Podrazo relied upon the fact that A.T. had been convicted of minor in possession after an incident that occurred in August 2011. On that date, police found A.T. walking barefoot in the street in the early morning hours, unsure of where she was or how she had gotten there. She was later determined to have a blood alcohol content of .252. Podrazo argued that this incident coupled with the December 2010 incident at issue here constituted a "habit." The court

denied Podrazo's motion, finding that two events separated by 8 months were not sufficient to constitute habit.

### 4. Trial

The witnesses at trial testified regarding the events on December 23 and 24, 2010. In his defense, Podrazo called a consulting toxicologist, Dr. Michael Corbett, to testify. Dr. Corbett explained the effects alcohol has on the human body; specifically, that alcohol can cause "disinhibition," which "makes you want to enjoy things that one probably wouldn't do in a sober state." According to Dr. Corbett, alcohol also impacts psychomotor skills and executive functioning, which is the function that will generally ensure that a person does not do things that "maybe one would like to do but shouldn't do because he knows better in . . . a social situation."

Dr. Corbett explained that some people will experience a "blackout" while drinking and that an alcoholic blackout is different from passing out, because blacking out is the inability to form long-term memories from short-term memories even though the person is totally conscious, whereas passing out refers to the onset of sleep. Stated more succinctly, a person is still conscious during a blackout, but there is no consciousness when one passes out. Dr. Corbett testified that other people cannot tell when a person is in a state of blackout. However, a person experiencing a blackout would most likely still display signs of intoxication.

Podrazo asked Dr. Corbett if he had an opinion as to whether A.T. experienced disinhibition from consumption of alcohol and whether her alcohol consumption impaired her judgment and executive functioning. The State objected, on the grounds of foundation and relevance, to Dr. Corbett's stating these opinions, and the court sustained the objections. Dr. Corbett was also asked for his opinion as to when A.T.'s blackout would have ended. The court again sustained the State's objections on the grounds of foundation and relevance.

### 5. Jury Instructions

At the jury instruction conference, Podrazo requested that the jury be given NJI2d Crim. 8.0, the instruction on the defense of intoxication. The court overruled Podrazo's

request, stating that instruction 8.0 relates to intoxication by the defendant and was not applicable in this case.

## 6. VERDICT AND SENTENCING

The jury ultimately convicted Podrazo on both counts. He was sentenced to 40 to 50 years' imprisonment for the sexual assault conviction and a consecutive term of 10 to 16 years' imprisonment for attempted assault.

## 7. POSTTRIAL MOTIONS

After trial, Podrazo moved for a new trial. He argued he was entitled to a new trial, inter alia, because he was denied pretrial access to basic juror information and because of juror and prosecutorial misconduct during trial. We will describe the factual bases for these arguments more fully in our analysis below. The district court denied Podrazo's motion for new trial.

Podrazo now appeals to this court.

## III. ASSIGNMENTS OF ERROR

Podrazo alleges, consolidated and restated, that the district court erred in (1) overruling his motion to suppress and admitting evidence from his Blazer; (2) refusing to allow him to introduce evidence of A.T.'s habits of blackouts and sexual relations during blackout, habitual intoxication connected with sexual activity, and memory impairment as a result of chronic substance abuse; (3) refusing him discovery access to A.T.'s mental health records; (4) refusing to allow Dr. Corbett to testify regarding the effect of A.T.'s alcohol consumption on her executive functioning and decisionmaking and when A.T.'s blackout ended; (5) refusing his proffered jury instruction; (6) refusing to admit into evidence certain exhibits offered in support of his motion for new trial; (7) overruling his motions for mistrial and new trial; and (8) imposing excessive sentences.

## IV. ANALYSIS

### 1. MOTION TO SUPPRESS

Podrazo argues that the district court erred in denying his motion to suppress the evidence found in his Blazer, because

the Omaha Police Department officers acted outside the geographic boundaries of their jurisdiction and the seizure did not meet any of the exceptions to the warrant requirement. Before addressing the merits of Podrazo's motion to suppress, we must address the State's arguments that this issue has not been properly preserved for appeal.

[1,2] The State contends Podrazo failed to properly preserve this issue, because he did not timely renew his motion to suppress at trial. In a criminal trial, after a pretrial hearing and order denying a motion to suppress, the defendant must object at trial to the admission of evidence sought to be suppressed to preserve an appellate question concerning admissibility of that evidence. *State v. Timmens*, 263 Neb. 622, 641 N.W.2d 383 (2002). A failure to object to evidence at trial, even though the evidence was the subject of a previous motion to suppress, waives the objection, and that party will not be heard to complain of the alleged error on appeal. *Id*.

At trial, evidence of what was seized from Podrazo's Blazer was introduced through the testimony of two witnesses and the parties' stipulation to the DNA test results. Podrazo did not object to this evidence at the time it was introduced. After the State rested its case in chief, Podrazo renewed his motion to suppress. The trial court then stated:

> [M]y recollection is that we had talked in advance and the agreement was you needn't make your objections at the time. You could renew them the first time the jury was out of — the first reasonable time when the jury was not present with the same effect as if you had made them, and the basis was the suppression ruling briefly.
>
> . . . .
>
> . . . All of that is treated as if you had appropriately objected. My ruling would be that the objections were overruled consistent with my prior order in the suppression hearing.

Based on this comment, we understand the parties agreed that Podrazo was not required to object at the time the evidence was introduced, but, rather, that he could wait until the first reasonable time outside the presence of the jury. The parties' agreement, coupled with the fact that the trial court treated

Podrazo's renewal of his motion to suppress as if he had appropriately objected, is sufficient for us to address this assignment of error. We caution counsel, however, that any agreements between them or among them and the court should appear on the record and not be left to a regurgitation by the court as to what those agreements entailed.

[3] The State also alleges that even if Podrazo properly renewed his objection at trial, he still waived the objections made in his motion to suppress, because he stipulated to the admission of the DNA test results. A concession or stipulation as to a fact made for the purpose of trial has the force and effect of an established fact binding on the party making the same, as well as on the court, unless the court in its reasonable discretion allows the concession to be later withdrawn, explained, or modified if it appears to have been made by improvidence or mistake. *State v. Davis*, 224 Neb. 205, 397 N.W.2d 41 (1986). Here, Podrazo stipulated only to the fact that blood found on the Blazer's rear seat cushion and an ice scraper found in the cargo area of the Blazer matched A.T.'s DNA. He did not stipulate that the blood was properly seized or otherwise waive any arguments made in his motion to suppress with respect to the manner in which the blood samples were collected. We will therefore address this assignment of error.

### (a) Jurisdiction

Podrazo argues the evidence found in his Blazer should have been suppressed because the vehicle was seized by Omaha police officers from his residence, which is outside of the Omaha city limits. The State contends this argument has been waived for appellate review, because it was not raised in the trial court. We disagree because the record indicates the jurisdiction issue was raised at the hearing on Podrazo's motion to suppress and at the hearing on his motion for new trial.

At the suppression hearing, testimony was elicited from Love that Omaha police requested a Douglas County sheriff's deputy to accompany them to Podrazo's residence. Love testified that she and Seaton asked the deputy to tow the

Blazer because they knew the vehicle was located in Douglas County's jurisdiction.

At the posttrial hearing on Podrazo's motion for new trial, Podrazo repeated his argument that the evidence obtained from his Blazer should have been suppressed because Omaha police officers were outside their jurisdiction when the Blazer was seized. The court then asked the State whether it was prepared to address the "vehicle issue." The following colloquy then took place:

> [The State]: I was not considering it. I was here at the motion to suppress, Your Honor. I know that issue came up, and I believe it was addressed. I honestly don't recall.
>
> THE COURT: All right.
>
> [The State]: I know I briefed the matter. I'm — I apologize.
>
> THE COURT: That's okay. Your — your contention would be then that because they had a deputy sheriff there and were acting in concert, that that made everything okay?
>
> [The State]: Yes, Your Honor. I believe that's what was at the suppression hearing.

Based on the foregoing, we conclude that this issue was presented to the trial court via both the motion to suppress and the motion for new trial. It was therefore properly preserved for our consideration on appeal.

[4] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, we apply a two-part standard of review. Regarding historical facts, we review the trial court's findings for clear error. But whether those facts trigger or violate Fourth Amendment protections is a question of law that we review independently of the trial court's determination. *State v. Bromm*, 285 Neb. 193, 826 N.W.2d 270 (2013).

Podrazo claims the seizure of his Blazer was unlawful because Omaha police officers acted outside the geographic boundaries of their jurisdiction. He cites to Neb. Rev. Stat. § 29-215 (Reissue 2008) to assert that "[t]he illegality of [Omaha police's] seizure was not cured by the mere presence of the Douglas County deputy sheriff" and that the State has

the burden to produce affirmative evidence of an interlocal agreement allowing law enforcement officers to act outside their jurisdiction. Brief for appellant at 27.

Podrazo is misconstruing the facts of this case. Section 29-215 authorizes law enforcement officers to act outside their primary jurisdiction in limited circumstances. But it was not Omaha police officers who performed the seizure of the Blazer; it was the Douglas County sheriff's deputy. Although Omaha police directed the sheriff's deputy to seize the Blazer, the sheriff's deputy was the officer who actually towed the vehicle. Podrazo cites to no authority supporting his argument that these actions were unlawful and that the officers who have proper jurisdiction must be the ones directing the investigation, nor did we find any indicating this to be true.

We noted in *State v. Hill*, 12 Neb. App. 492, 677 N.W.2d 525 (2004), that the detention of a suspect by an officer outside his jurisdiction was appropriate in part because the detention lasted for only a brief period before local law enforcement officers, whose authority was not at issue on appeal, arrived on the scene and effected a lawful arrest. Similarly, in this case, the Douglas County sheriff's deputy, whose authority to seize the Blazer is not at issue, arrived at Podrazo's residence before any property was seized and was the officer who towed the Blazer. While we recognize that the situation presented in *Hill* is distinguishable from the present case, we find our rationale relevant nonetheless. We therefore find that the seizure of the Blazer was lawful, and the district court properly denied Podrazo's motion to suppress on this basis.

### (b) Warrant Exception

Podrazo also asserts that the district court erred in denying his motion to suppress, because his Blazer was seized without a warrant and none of the exceptions to the warrant requirement apply. The State contends that the vehicle was properly seized because it was readily mobile and officers had probable cause to believe it contained evidence of a crime.

[5-8] The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution protect individuals against unreasonable searches and seizures by the government.

*State v. Smith*, 279 Neb. 918, 782 N.W.2d 913 (2010). These constitutional provisions do not protect citizens from all governmental intrusion, but only from unreasonable intrusions. *Id*. Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions, which must be strictly confined by their justifications. *Smith, supra*. The warrantless search exceptions recognized by Nebraska courts include searches undertaken with consent, searches justified by probable cause, searches under exigent circumstances, inventory searches, searches of evidence in plain view, and searches incident to a valid arrest. See *id*. In the case of a search and seizure conducted without a warrant, the State has the burden of showing the applicability of one or more of the exceptions to the warrant requirement. *Id*.

[9,10] In *State v. Alarcon-Chavez*, 284 Neb. 322, 821 N.W.2d 359 (2012), the Nebraska Supreme Court upheld the warrantless seizure of a vehicle because it was supported by probable cause. In that case, police officers seized the defendant's vehicle and then later searched it after obtaining a search warrant. The Nebraska Supreme Court explained that the warrantless seizure of a vehicle is lawful when the officers could have immediately searched the vehicle without a warrant. See *id*. Whether a warrantless search of a vehicle could have been conducted is determined by whether the vehicle was readily mobile and the officers had probable cause to believe the vehicle contained contraband or evidence of a crime. See *id*.

In reaching this conclusion, the court relied on federal cases discussing the "automobile exception" to the warrant requirement. The court pointed out that in *Chambers v. Maroney*, 399 U.S. 42, 52, 90 S. Ct. 1975, 26 L. Ed. 2d 419 (1970), the U.S. Supreme Court first recognized:

> For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.

Similarly, the *Alarcon-Chavez* court cited *U.S. v. Brookins*, 345 F.3d 231 (4th Cir. 2003), wherein the Fourth Circuit upheld the warrantless seizure of a vehicle from private property because the vehicle was readily movable, the officers had probable cause to search the vehicle at the time it was discovered, and the probable cause factor still existed at the time of the search.

In *Alarcon-Chavez*, the Nebraska Supreme Court found that both elements to the automobile exception were present. First, the defendant's vehicle was operational and therefore readily movable. In addition, probable cause supported an at-the-scene search, because officers knew that the victim had been severely injured with a knife, a knife was found in the victim's apartment, and a set of knives with one knife missing was clearly visible in the defendant's vehicle. Given probable cause to search the vehicle in the parking lot of the apartment, the court held that it was equally permissible for the officers to tow the vehicle and later obtain a warrant.

Podrazo argues that *Alarcon-Chavez* does not control this case, but we disagree and find that both requisites are met in this case. Podrazo claims his Blazer was not movable, because police officers had the keys and the vehicle was parked and locked with the windows up. Under *Alarcon-Chavez, supra*, and *Brookins, supra*, however, this is not the test for mobility. In *Brookins*, the district court concluded that on the facts presented—the ease with which officers could have blocked the defendant's automobile and the fact that the vehicle was unoccupied when discovered by the officers—a warrant was required to search and seize the vehicle because it was not "readily mobile." On appeal, the Fourth Circuit disagreed, viewing ready mobility as defining the nature of the *use* of the vehicle, rather than its ability to be moved by a defendant upon stop or seizure. Thus, the Fourth Circuit in *Brookins* and the Nebraska Supreme Court in *Alarcon-Chavez* found that a vehicle is readily movable when it is operational. This factor is present here.

Podrazo also argues that probable cause did not exist, because Podrazo made no statement, he was not arrested, officers did not see him commit a crime or with evidence

of a crime, and there was no evidence found in plain view. But those are not the only factors pertinent to a probable cause inquiry.

[11-13] Probable cause escapes precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. *State v. Smith*, 279 Neb. 918, 782 N.W.2d 913 (2010). Probable cause is a flexible, commonsense standard. It merely requires that the facts available to the officer would warrant a person of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. *Id*. We determine probable cause by an objective standard of reasonableness, given the known facts and circumstances. *Id*.

We conclude that probable cause existed in this case because, based on the facts available to police at the time, it was reasonable for them to believe the Blazer contained evidence of a crime. Love testified at the suppression hearing that on December 24, 2010, she knew the Blazer was registered to Podrazo and that witnesses who had been at the Maple Street residence the previous night told her that when they noticed Podrazo and A.T. were missing, they discovered the Blazer was missing as well. Additionally, Love knew that Podrazo had handwritten the note admitting that he and A.T. had had sexual contact in the Blazer on the previous night. Moreover, the nurse told Love of the extent and cause of A.T.'s injuries that had been discovered during the sexual assault examination. Based on this information, it was reasonable for police officers to believe the Blazer contained evidence of the possible sexual assault of A.T. Given probable cause to search the Blazer at Podrazo's residence, it was equally permissible for officers to tow the vehicle and later obtain a warrant. We therefore conclude that the district court did not err in overruling Podrazo's motion to suppress.

## 2. Evidence

Podrazo argues the district court erred in refusing to allow him to introduce evidence of A.T.'s habits of blackouts,

previous sexual relations during blackout, habitual intoxication connected with sexual activity, and memory impairment as a result of chronic substance abuse. As the State points out, this assignment appears to address three separate motions made by Podrazo. We will address each individually.

### (a) Other Sexual Behavior

[14,15] Podrazo alleges the district court erred in denying his request to offer evidence that at least once prior to the events in question, A.T. engaged in voluntary sexual activity during an alcoholic blackout, and that she admitted during her deposition that she is "always" drunk or high when she engages in sexual relations. In all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by the Nebraska Evidence Rules, not judicial discretion, except in those instances under the rules when judicial discretion is a factor involved in determining admissibility. *State v. Lessley*, 257 Neb. 903, 601 N.W.2d 521 (1999). Where, as here, the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion. *Id*.

Under Nebraska's rape shield statute, evidence of a victim's prior sexual behavior or sexual predisposition is not admissible except under the following limited circumstances in a criminal case:

(i) Evidence of specific instances of sexual behavior by the victim offered to prove that a person other than the accused was the source of semen, injury, or other physical evidence;

(ii) Evidence of specific instances of sexual behavior of the victim with respect to the accused offered by the accused to prove consent of the victim if it is first established to the court that such behavior is similar to the behavior involved in the case and tends to establish a pattern of behavior of the victim relevant to the issue of consent; and

(iii) Evidence, the exclusion of which would violate the constitutional rights of the accused.

Neb. Rev. Stat. § 27-412(2)(a) (Cum. Supp. 2012). Subsection (i) does not apply here, because there was no evidence or allegation that anyone other than Podrazo was the source of A.T.'s injuries. Similarly, subsection (ii) is not applicable, because there was no evidence of a prior sexual history between A.T. and Podrazo.

[16] Podrazo argues that under § 27-412(2)(a)(iii) and the Nebraska Supreme Court's decision in *Lessley, supra*, the exclusion of his proffered evidence violated his right to confrontation and to present a full defense under the Sixth Amendment to the U.S. Constitution. The Sixth Amendment provides that "'[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him; [and] to have compulsory process for obtaining witnesses in his favor . . . .'" *Lessley*, 257 Neb. at 908, 601 N.W.2d at 526.

In *Lessley*, the Supreme Court found that even though evidence was inadmissible under the rape shield law, it was admissible on constitutional grounds because of a defendant's right to confront his accuser. In its direct examination of the victim, the State introduced evidence that she was a lesbian. The trial court refused to allow the defendant to introduce evidence to contradict the victim's denial that she told a coworker that she engaged in anal intercourse with men. On appeal, the Nebraska Supreme Court ruled that the defendant's Sixth Amendment right to confront his accuser on the dispositive issue of consent required that he be allowed to explore this matter, because the direct examination regarding the victim's sexual preference and experience permitted the jury to draw an inference that as a lesbian, she would not consent to sexual relations with the defendant. Finding that the evidence the defendant wanted to offer would have made this critical inference less probable and that the State had opened the door to the victim's sexual past, the Supreme Court reversed the trial court's decision not to allow its admission.

*Lessley* is distinguishable from the case at hand, because here, the State did not open the door by inquiring into A.T.'s sexual past. Any inference the jury could make that A.T. did not consent to sexual relations with Podrazo was based only on

A.T.'s testimony with respect to Podrazo himself. For example, A.T. testified that she had met Podrazo on only two prior occasions and that she did not even remember seeing him on December 23, 2010. The State did not adduce any testimony regarding A.T.'s prior sexual history, including whether she has previously engaged in sexual activity while under the influence or during an alcoholic blackout. Accordingly, Podrazo's right to confront A.T. was not impermissibly restricted, and we conclude that the district court did not abuse its discretion in refusing to allow Podrazo to introduce evidence of A.T.'s sexual history.

### (b) Prior Substance Abuse and Mental Health Issues

[17,18] Podrazo alleges the district court erred in denying his request to offer evidence that A.T. had previously been diagnosed with mental health issues, substance abuse, and cognitive difficulties and had received treatment for these conditions. He argues this evidence was relevant to A.T.'s credibility and the issue of her consent. The exercise of judicial discretion is implicit in determinations of relevancy and prejudice, and a trial court's decision regarding them will not be reversed absent an abuse of discretion. See *State v. Aguilar-Moreno*, 17 Neb. App. 623, 769 N.W.2d 784 (2009). Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Neb. Rev. Stat. § 27-401 (Reissue 2008).

A.T. admitted in her deposition that she was convicted of minor in possession when she was in high school in 2009. As a result, she was required to attend a treatment program, which she completed in 2009. As for the mental health issues and cognitive difficulties Podrazo references, A.T. testified during her deposition that while attending treatment for her minor in possession conviction, she was told that her "learning was off," but she stated that this did not make sense to her because she graduated from high school early with more credits than necessary. A.T. was also diagnosed with slight

anxiety and depression and was prescribed a low dose of an antidepressant, but she discontinued the medication in 2009 or 2010.

Podrazo admitted that the evidence he wanted to introduce occurred approximately 12 to 18 months prior to December 2010, when A.T. was still in high school. Although he argues this evidence is relevant to A.T.'s credibility, A.T. testified at trial that she could not remember anything between the time she returned to the Maple Street residence and the time she woke up in the hospital. We therefore cannot say the district court abused its discretion in refusing to allow Podrazo to introduce evidence of events that took place more than a year prior to the incident here and had no bearing on the events of that night or A.T.'s ability to recall them.

### (c) Habit of Wandering and Intoxication

Podrazo argues the district court erred in denying his request to introduce evidence of A.T.'s "habit" of drinking to the point of blacking out and wandering around while intoxicated and inappropriately dressed.

Habit evidence is governed by § 27-406, which provides:

> (1) Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

> (2) Habit or routine practice may be proved by testimony in the form of an opinion or by specific instances of conduct sufficient in number to warrant a finding that the habit existed or that the practice was routine.

[19] The exercise of judicial discretion is implicit in determinations of relevancy and admissibility under § 27-406, and as a result, the trial court's decision will not be reversed absent an abuse of discretion. *Hoffart v. Hodge*, 9 Neb. App. 161, 609 N.W.2d 397 (2000).

[20,21] This court has previously noted that the "precise contours of how frequently and consistently a behavior must

occur to rise to the level of habit cannot be easily defined or formulated," and thus concluded that admissibility depends on the trial judge's evaluation of the particular facts of the case. *Id*. at 167, 609 N.W.2d at 403. The Nebraska Supreme Court, however, has concluded that evidence of a single incident, even if it is true, is an insufficient showing of a "routine" or "habit." See *State v. Edwards*, 278 Neb. 55, 767 N.W.2d 784 (2009).

In this case, Podrazo sought to establish that A.T. had a habit of wandering around during intoxication while inappropriately dressed, arguing this "habit" offered an alternative explanation for how she ended up in the position in which she was found near the Pratt Street residence. However, Podrazo was able to provide evidence of only one occasion on which A.T. performed this "habit." There was no evidence that A.T. wandered away from the Maple Street residence on the night of December 23, 2010. The August 2011 incident alone is insufficient to establish a habit, and therefore, the district court did not abuse its discretion in overruling Podrazo's motion. This assignment of error is without merit.

### 3. Access to Mental
### Health Records

[22] Podrazo argues the district court erred in refusing to allow him discovery access to A.T.'s medical and mental health records pursuant to *State v. Trammell*, 231 Neb. 137, 435 N.W.2d 197 (1989). A trial court has broad discretion in granting discovery requests and errs only when it abuses its discretion. *State v. Vela*, 279 Neb. 94, 777 N.W.2d 266 (2010).

At the outset, we note that the State claims this issue has not been properly preserved for appeal, because Podrazo did not renew his motion pursuant to *Trammell, supra*, prior to A.T.'s testimony at trial. The State argues that because Podrazo requested access to A.T.'s medical records or, in the alternative, that the court prevent A.T. from testifying, the motion should be considered a motion in limine to exclude A.T.'s testimony.

We disagree. In *Trammell*, the Nebraska Supreme Court held that in a situation where the defendant should be allowed

to inquire into the witness' current medical condition but the witness refuses to waive physician-patient privilege, the exclusion of the witness' testimony is the remedy. Thus, the issue is whether the defendant should be permitted to inquire about the witness' medical condition, not whether the witness' testimony should be excluded. Notably, on appeal, Podrazo assigns and argues only that the court erred in refusing to allow him access to A.T.'s medical records, not that the court erred in allowing A.T. to testify. Accordingly, the motion that Podrazo is appealing is the discovery motion, not a motion in limine. We will therefore address the merits of this assignment.

[23,24] Generally, confidential communications made by a patient to a physician or professional counselor for the purposes of diagnosis and treatment are privileged. See Neb. Rev. Stat. § 27-504 (Reissue 2008). In *Trammell, supra*, the Nebraska Supreme Court recognized that a problem arises when attempting to accommodate the witness' right to maintain the privilege and the defendant's right to confront the witnesses against him. The court determined that the result is that the testimony of the witness is inadmissible. Before this remedy is available, however, the defendant must make a showing that the failure to produce the privileged information is likely to impair the defendant's ability to effectively cross-examine the witness claiming the privilege. See *id*. If the defendant succeeds in making such a showing, the court "'may then afford the state an opportunity to secure the consent of the witness for the court to conduct an in camera inspection of the claimed information and, if necessary, to turn over to the defendant any relevant material for the purposes of cross-examination.'" *Id*. at 143, 435 N.W.2d 201. If the witness does not consent, "'the court may be obliged to strike the testimony of the witness.'" *Id*.

Following this procedure, the Supreme Court in *Trammell* found reversible error when the victim was allowed to testify without allowing the defendant to discover evidence concerning the victim's current mental health treatment. The victim in that case was 40 years old at the time of trial. She had been receiving mental health care since she was 13 and had

been institutionalized on three occasions, the last admission being when she was 27 years old. Since her last institutionalization and including at the time of the assault, the victim had been taking medication to control a psychosis. On appeal, the Supreme Court found that any inquiry into the victim's hospitalization or treatment while she was confined was too remote in time to have any relevance to the matter at hand. The victim's current treatment, however, was found to be relevant.

In this case, the trial court refused to allow Podrazo discovery access to A.T.'s medical records based on a finding that he had failed to show that denial of access to the records would deny his right to confront the witness. We conclude this was not an abuse of discretion. Podrazo argues that had the court granted his discovery motion, he "would have been able to ascertain if there were even more instances of [A.T.'s] conduct that would bolster evidence of her habits and practice regarding intoxication and sexual activities" as described above. Brief for appellant at 32. *State v. Trammell*, 231 Neb. 137, 435 N.W.2d 197 (1989), does not authorize a "fishing expedition," however. See *State v. Schreiner*, 276 Neb. 393, 754 N.W.2d 742 (2008).

In addition, the victim-witness in *Trammell, supra*, had a lengthy history of psychiatric problems and was taking medication at the time of the sexual assault to control them. In the present case, Podrazo never claimed that A.T.'s ability to recall or recount the events of December 23, 2010, was in any way impaired due to a mental condition or psychotropic medication, about which he was entitled to inquire. In fact, A.T. admitted she was unable to remember the events of December 23 anyway, so any medical condition or treatment would have no bearing on her testimony surrounding the events that occurred that evening. Accordingly, this assignment of error is meritless.

### 4. Expert Testimony

[25-28] Podrazo alleges the district court erred in restricting the testimony of Dr. Corbett. The trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an

expert's opinion. *State v. Huff*, 282 Neb. 78, 802 N.W.2d 77 (2011). A trial court has broad discretion in determining how to perform its gatekeeper function. *Id*. The standard for reviewing the admissibility of expert testimony is abuse of discretion. *State v. Casillas*, 279 Neb. 820, 782 N.W.2d 882 (2010). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*.

Specifically, Podrazo claims Dr. Corbett should have been allowed to state his opinion regarding the effect of A.T.'s alcohol consumption on her executive functioning and decisionmaking and regarding when A.T.'s blackout ended on December 23 or 24, 2010. The trial court sustained the State's objections to these opinions on the grounds of foundation and relevance. Through Dr. Corbett's testimony, Podrazo was attempting to establish that despite A.T.'s high blood alcohol content on the morning of December 24, because she was an experienced drinker with a high tolerance for alcohol, her decisionmaking was not nearly as affected as that of someone with a lower tolerance. This could then lead the jury to infer that A.T. still could have formed the capacity to consent to sexual activity with Podrazo.

Dr. Corbett explained that in general, people can develop a tolerance to alcohol and become less impacted by its effects. With respect to A.T.'s tolerance, however, the court granted the State's objection to Dr. Corbett's testifying that he read in A.T.'s deposition that she admitted she has a very high tolerance for alcohol. The court noted for the jury that any evidence relating to A.T.'s drinking was limited to the day of the incident. Thus, there was no admissible evidence regarding A.T.'s history of drinking and corresponding high tolerance upon which Dr. Corbett could base his opinion as to whether alcohol affected A.T.'s decisionmaking on December 23, 2010. Because Dr. Corbett did not demonstrate that he had any scientific way of determining whether A.T.'s decisionmaking was affected solely based on the data he reviewed and the admissible evidence, we cannot conclude that the district court abused

its discretion in finding there was insufficient foundation for this opinion.

Similarly, it was not an abuse of discretion for the district court to refuse to allow Dr. Corbett to opine as to when A.T.'s blackout ended. Dr. Corbett explained that most total blackouts end when a person has gone through a sleep cycle and wakes up. Based on A.T.'s deposition, Dr. Corbett knew that her blackout began shortly after she returned to the Maple Street residence after eating dinner. He also knew, based on the police reports, that she was found unconscious in the street shortly before midnight. Dr. Corbett testified that the unconscious condition in which A.T. was discovered was consistent with the "pass-out" that comes after a blackout. He admitted, however, that he was unable to determine when A.T.'s period of unconsciousness began. Based on this testimony, the trial court properly sustained the State's foundational objection to Dr. Corbett's opinion as to when A.T.'s blackout ended, and we reject this assignment of error.

## 5. Jury Instruction

[29,30] Podrazo claims the district court erred in refusing his proffered jury instruction. Podrazo requested that the jury be instructed on the defense of intoxication. This instruction provides:

> There has been evidence that the defendant was intoxicated at the time that the (here insert crime) with which (he, she) is charged was committed.
>
> Intoxication is a defense only when a person's mental abilities were so far overcome by the use of (alcohol, drugs) that (he, she) could not have had the required intent. You may consider evidence of (alcohol, drug) use along with all the other evidence in deciding whether the defendant had the required intent.

NJI2d Crim. 8.0. Whether a jury instruction is correct is a question of law, regarding which an appellate court is obligated to reach a conclusion independent of the determination reached by the trial court. *State v. Smith*, 282 Neb. 720, 806 N.W.2d 383 (2011). A trial court is not obligated to instruct

the jury on matters which are not supported by evidence in the record. *Id*.

Podrazo argues the circumstantial evidence establishes that he was intoxicated on the night of December 23, 2010. He directs the court's attention to witness testimony that he was part of the group that night, drinking alcohol and using drugs, and to his handwritten note confirming that he and A.T. had been drinking, that things "got a little crazy," and that "it was pretty rough."

According to our review of the record, all of the witnesses who testified at trial remembered seeing Podrazo at the Maple Street residence on the night of December 23, 2010, but none were able to describe his condition. The only evidence about Podrazo's drinking came from Smith, who testified that he saw Podrazo "take some shots," and from Podrazo's note in which he confirmed that he had been drinking. While this evidence may support Podrazo's claim that he was drinking, it is insufficient to establish that he was intoxicated to the extent that his mental abilities were overcome by the use of alcohol or drugs.

[31] To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Wisinski*, 268 Neb. 778, 688 N.W.2d 586 (2004). Because the record does not establish that the tendered instruction was warranted by the evidence, the district court did not err in refusing to instruct the jury on the defense of intoxication.

## 6. Exhibits in Support of Motion for New Trial

Podrazo alleges the district court erred in refusing to admit into evidence exhibits 91 and 93 through 100, offered in support of his motion for new trial. At the outset, we note that the State argues we should decline to address this issue because it is not necessary to adjudicate the controversy before us. The State claims that the exhibits were offered in support of

Podrazo's argument that he was entitled to a new trial based on the fact that three jurors did not disclose certain information during voir dire, but, the State argues, Podrazo did not assign or argue that ground for a new trial on appeal.

We agree that Podrazo does not argue on appeal that he was entitled to a new trial based on nondisclosure of information by certain jurors. He does, however, argue that he is entitled to a new trial because he was denied pretrial access to basic juror information and that, had he received even just the names of potential jurors prior to trial, he could have discovered the information they failed to provide during voir dire. For this reason, we find it necessary to address this assignment of error.

At the hearing on his motion for new trial, Podrazo offered numerous exhibits. On appeal, he challenges the court's refusal to receive nine exhibits into evidence. He argues that because the exhibits were properly authenticated, the court should have received them. The ground on which the court sustained the State's objections, however, was relevance, not foundation. Therefore, we will address whether the district court erred in concluding these exhibits lacked relevance.

The record reveals that two of those exhibits (exhibits 93 and 100) were actually received without objection. The remaining exhibits include an affidavit of a senior certified law clerk regurgitating what occurred during voir dire, and court records regarding petitions for protection orders, protection orders, or criminal complaints involving three of the jurors.

The proffered affidavit is from a senior certified law clerk who assisted Podrazo's counsel during trial. In his affidavit, the law clerk describes matters he heard take place during voir dire, such as questions posed to the potential jurors and their responses or lack of responses. The court admitted portions of the affidavit into evidence, but excluded other portions as hearsay or irrelevant.

[32,33] In *State v. Lafler*, 225 Neb. 362, 405 N.W.2d 576 (1987), *abrogated on other grounds, State v. Oldfield*, 236 Neb. 433, 461 N.W.2d 554 (1990), the Nebraska Supreme Court concluded that errors predicated on occurrences during the course of voir dire examination cannot be shown by

affidavit. The court stated that it "will not undertake to resolve disputes about what is claimed to have happened, when a record of the voir dire examination could have been made." *Id*. at 375, 405 N.W.2d at 585. The court, therefore, found no abuse of discretion when the trial court denied the defendant's request to present testimony regarding the voir dire examination of the jury.

Likewise here, Podrazo could have requested that a record of the voir dire examination be made, but he did not. He attempted, through the law clerk's affidavit, to recreate the record, but this is not permissible. The district court allowed portions of the affidavit into evidence, but refused other portions as inadmissible hearsay. The excluded portions attempted to re-create what occurred during voir dire, and the trial court did not abuse its discretion in refusing to receive those portions of the exhibit into evidence.

Similarly, we cannot find the district court abused its discretion in sustaining the objections to the court records on the basis of relevancy. At the hearing on the motion for new trial, Podrazo offered these exhibits in support of his argument that three jurors had failed to disclose during voir dire information regarding their involvement in domestic violence situations. Because we conclude that the voir dire examination not conducted on the record cannot be re-created through affidavit, these exhibits lack relevance to the matter before the district court. Without a record establishing what occurred during voir dire, any evidence attempting to show that certain jurors failed to disclose information is not relevant. Therefore, this assignment of error is without merit.

### 7. Motions for Mistrial or New Trial

[34,35] Podrazo argues the district court erred in overruling his motions for mistrial and new trial on three bases. We will address each separately. We will not disturb a trial court's decision whether to grant a motion for mistrial unless the court has abused its discretion. *State v. Thorpe*, 280 Neb. 11, 783 N.W.2d 749 (2010). Likewise, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion

is shown, the trial court's determination will not be disturbed. *State v. Scott*, 284 Neb. 703, 824 N.W.2d 668 (2012).

### (a) Juror Information

Podrazo claims he was entitled to a new trial because he was denied pretrial access to prospective juror questionnaires and basic information. In an attempt to obtain this information prior to trial, counsel contacted the office of the clerk of the district court and the jury commission office directly. Counsel admitted that she never moved the court for an order granting her access to juror information, and she did not present this issue to the district court until her motion for new trial. Accordingly, we cannot find the district court abused its discretion in refusing to grant Podrazo's motion for new trial on an issue that was not presented timely to the district court for consideration. See *State v. Caddy*, 262 Neb. 38, 628 N.W.2d 251 (2001).

### (b) Jury Misconduct

Podrazo argues that the trial court erred when it overruled his motions for mistrial and new trial based on improper communications between a juror and an employee of the county attorney's office. One of the members of the jury was a former courthouse employee. At a recess during the second day of trial, the juror recognized an employee of the Douglas County Attorney's office, who was working as a victim advocate for the trial. The two shared a hug and engaged in a brief conversation concerning their families and personal lives but did not discuss the trial.

The morning of the fourth day of trial, Podrazo moved for a mistrial based on jury misconduct. Counsel explained the delay, stating that she did not become aware of the contact until after the third day of trial. The court initially stated that it was going to grant the mistrial based upon information of the contact's occurring in the midst of other jurors and the victim witness advocate being present. The State requested that the court poll the jurors to determine whether any of them had, in fact, observed the contact, because counsel for the State indicated that no other jurors were present at

the time of contact. Podrazo resisted that request. The court declined the State's request, stating that polling the jurors would reinforce the issue, which would create a larger problem. The court ultimately concluded that it would not grant a mistrial, based upon the court's impression of the jury as being conscientious of its duties. The court based its impression on a situation that occurred earlier in the trial in which a juror provided the court with a note alerting it to the fact that another juror was texting during testimony. The court concluded that this indicated the jury was aware of its duties and obligations. Based upon the admonitions to the jurors and the absence of any report from the jurors regarding the contact, the court denied the motion.

The court conducted a followup hearing on the motion for mistrial, at which time it questioned the county employee who had juror contact. Podrazo's counsel conducted cross-examination and elicited testimony from Podrazo's mother, who also observed the contact. The evidence revealed that the employee and the juror had contact in the rotunda area while A.T. and her mother were seated in the hallway outside the courtroom. After clarifying this information, the court restated its decision to deny the motion for mistrial.

At the hearing on the motion for new trial, the State offered an affidavit from the juror, wherein she admitted to the encounter but stated that she "did not further consider or think about this contact during any portion of the remainder of the trial or deliberations." The court overruled the motion for new trial.

[36-38] A criminal defendant claiming jury misconduct bears the burden of proving, by a preponderance of the evidence, (1) the existence of jury misconduct and (2) that such misconduct was prejudicial to the extent that the defendant was denied a fair trial. *State v. Thorpe*, 280 Neb. 11, 783 N.W.2d 749 (2010). When the misconduct involves a juror and a nonjuror, it gives rise to a rebuttable presumption of prejudice to the defendant which the State has the burden to overcome. See *id*. We review the trial court's determinations of witness credibility and historical fact for clear error; we review de novo the trial court's

ultimate determination whether the defendant was prejudiced by juror misconduct. *Id*.

The Nebraska Supreme Court in *Thorpe* found the trial court had correctly denied the defendant's motion for mistrial based on alleged juror misconduct, even though the record clearly showed improper communication between a juror and a witness. The court concluded that the State had overcome the presumption of prejudice to the defendant, because the communication was unrelated to any issue before the jury, the communication was to one juror only who did not share that communication with the other jury members, and the juror indicated that the communication would not affect his ability to remain impartial.

Similarly, in the case at hand, the record shows improper communication between a juror and a nonjuror. Therefore, a rebuttable presumption of prejudice to Podrazo arose, which presumption the State had the burden to overcome. We conclude the State overcame its burden to prove that Podrazo was not denied a fair trial, and therefore, the district court correctly denied Podrazo's motions for mistrial and new trial.

Under our de novo review, we find the conversation between the juror and employee was not related to any of the issues at trial, and the juror later testified by affidavit that she did not further consider this contact during the trial or deliberations. We further find that although the jurors could have observed A.T. and the employee together at various times during trial, they were not together when the embrace occurred. A.T. was in the hallway outside of the courtroom, and the employee and juror were in the rotunda. Therefore, even if other jurors observed the embrace, it did not occur in the presence of A.T. Based upon the testimony elicited, we find that the State overcame the presumption of prejudice. As such, this argument is without merit.

### (c) Prosecutorial Misconduct

[39,40] Based on the conversation between the county employee and the juror, Podrazo also alleges he was entitled to a mistrial or new trial on the basis of prosecutorial misconduct. When a prosecutor's conduct was improper, an appellate court

considers the following factors in determining whether the conduct prejudiced the defendant's right to a fair trial: (1) the degree to which the prosecutor's conduct or remarks tended to mislead or unduly influence the jury, (2) whether the conduct or remarks were extensive or isolated, (3) whether defense counsel invited the remarks, (4) whether the court provided a curative instruction, and (5) the strength of the evidence supporting the conviction. *State v. Watson*, 285 Neb. 497, 827 N.W.2d 507 (2013). Whether prosecutorial misconduct is prejudicial depends largely on the context of the trial as a whole. *Id*. Before it is necessary to grant a mistrial for prosecutorial misconduct, the defendant must show that a substantial miscarriage of justice has actually occurred. *Id*.

Assuming, without deciding, that the county employee's conduct was improper and could be considered prosecutorial misconduct, we conclude Podrazo has not shown that a substantial miscarriage of justice actually occurred or that he was prevented from having a fair trial. As stated above, the contact between the juror and the county employee was brief and they did not discuss the trial. The evidence is conflicting as to whether any of the other jurors actually witnessed the interaction, although it appears as though other jurors were in the area. It is undisputed, however, that A.T. was not present during the interaction. The juror involved in the interaction testified by affidavit that she did not further think about or consider the conversation during the remainder of the trial or deliberations. The evidence of A.T.'s injuries, her DNA found in Podrazo's Blazer, and his admission that they had had sexual contact on the night of December 23, 2010, supported the convictions. The district court did not abuse its discretion when it denied Podrazo's motions for mistrial and new trial.

## 8. EXCESSIVE SENTENCES

Podrazo alleges the court imposed excessive sentences. He acknowledges that it is difficult to "'color-match'" cases when reviewing sentences, but argues that his sentences "are impossibly out of step with sentences of imprisonment imposed in other first-degree sexual assault cases." Brief for appellant at 42-43.

Podrazo was convicted of first degree sexual assault, a Class II felony, and attempted first degree assault, a Class III felony. Neb. Rev. Stat. § 28-319 (Reissue 2008); Neb. Rev. Stat. § 28-308 (Cum. Supp. 2012); Neb. Rev. Stat. § 28-201(4)(b) (Cum. Supp. 2010). Class II felonies are punishable by 1 to 50 years' imprisonment, and Class III felonies are punishable by 1 to 20 years' imprisonment. Neb. Rev. Stat. § 28-105 (Reissue 2008). Podrazo was sentenced to 40 to 50 years' imprisonment on count I and a consecutive sentence of 10 to 16 years' imprisonment on count II. Thus, his sentences are within the statutory guidelines.

[41] Sentences within statutory limits will be disturbed by an appellate court only if the sentences complained of were an abuse of judicial discretion. See *State v. Bauldwin*, 283 Neb. 678, 811 N.W.2d 267 (2012). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. *Id.* In imposing a sentence, the sentencing court is not limited to any mathematically applied set of factors. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

The information contained in the presentence report indicates that Podrazo was 21 years old at the time of sentencing and led a relatively law-abiding life other than these charges. Other than traffic offenses, his criminal history includes a criminal mischief conviction and two driving under the influence convictions. During the pendency of this case, Podrazo attended an inpatient treatment facility for alcohol dependency. Podrazo graduated from high school, attended some college, and worked several construction jobs. The presentence report

contained eight letters of support for Podrazo from family and friends.

More important in this case, of the factors for consideration, are the nature of the offense and the amount of violence involved in the crime. The injuries Podrazo inflicted on A.T., who was only 19 years old at the time of the assault, are described above and were characterized by medical personnel as "[s]evere." A.T. testified that when she woke up in the hospital, she had pain everywhere, including in her vagina and anus. When she was released from the hospital on Christmas Day, she was still experiencing pain and had to use her hands to move her legs to get out of bed. She was sent home from the hospital with icepacks, wipes for her vaginal area to help with the pain, and pain medication. A letter written by A.T. and included in the presentence report describes the significant emotional, mental, and physical impact Podrazo's actions had on her life. Because the sentences are supported by competent evidence and within the statutory guidelines, we conclude the district court did not abuse its discretion in the sentences imposed.

### V. CONCLUSION

For the foregoing reasons, we find no merit to Podrazo's assigned errors. We therefore affirm his convictions and sentences.

AFFIRMED.

––––––––––––––

State of Nebraska, appellee, v.
Mathew W. Workman, appellant.
___ N.W.2d ___

Filed December 10, 2013.    No. A-12-888.

1. **Due Process.** The determination of whether the procedures afforded an individual comport with the constitutional requirements for procedural due process presents a question of law.
2. **Probation and Parole: Due Process.** The minimal due process to which a parolee or probationer is entitled also applies to participants in the drug court program. This minimal due process includes (1) written notice of the time and place of the hearing; (2) disclosure of evidence; (3) a neutral factfinding body